*1219 OPINION
By the Court,
Rose, J.:
Appellant Vernon Rockwell, his wife Londa, and their son Andrew lived in an apartment at respondent Sun Harbor Budget Suites (Sun Harbor). Londa was killed by Said Thamar, a Sun Harbor security guard, and Vernon and Andrew sued Sun Harbor on theories of respondeat superior, negligent hiring, training, and supervision, and breach of duty of care owed to the tenants. The district court dismissed all of the causes of action on summary *1220 judgment. We conclude that the district court’s order granting respondent’s motion for summary judgment was improper.

FACTS

Vernon, his wife Londa, and their son Andrew all lived in an apartment in Sun Harbor. While sitting by the swimming pool in mid-1992, Londa and Thamar met for the first time and allegedly began a sexual affair the next day. When Londa attempted to end the affair in January 1993, Thamar shot her eighteen times, killing her.
Thamar was hired by Bigelow Management (Bigelow) as a security guard and was provided to Sun Harbor in the same capacity. Elaine Olsen, the manager of Sun Harbor, claimed that because Bigelow hired and paid him, Thamar was a Bigelow employee. However, Thamar was provided with a free apartment at Sun Harbor as part of his compensation package, but it is unclear from the record whether the apartment was paid for by Bigelow or Sun Harbor. The issue of which entity was paying for Thamar’s services and apartment was clouded by the fact that Robert Bigelow was the president and treasurer of Bigelow and was also the treasurer of Sun Harbor, and the address for service of process for both corporations was the same. This raised the inference that Sun Harbor and Bigelow were somehow linked, but no other evidence regarding this issue was presented.
Thamar had a history of aggressive behavior which allegedly resulted in his being terminated from other security jobs. Thamar worked at Jerry’s Nugget as a security guard and was allegedly fired for insubordination when he got angry because his superior requested that he come to work clean shaven. Thamar also worked at Vegas World and was allegedly fired due to his aggressive and threatening demeanor. Additionally, on his job application with Bigelow, under the heading “military service,” Thamar listed that he was in the “bomb unit” of the Moroccan Marine Corps from 1977 through 1981.[1] Vernon claimed that a cursory check with the Moroccan embassy or local U.S. recruiter would confirm that the Moroccan military has no marine corps and no bomb unit; however, Vernon provided no evidence as to the truth of this assertion. Finally, Thamar was a convicted sex offender[2] and under Nevada law was required to register with the police. On his employment application, Thamar stated that he had not been convicted of any crimes, and there is no indication of whether he registered with the police.
*1221 Thamar’s aggressive behavior also extended to his relations with Vernon, and during the later stages of the extramarital affair with Londa, Thamar threatened Vernon on several occasions. On one occasion, Thamar flagged down Vernon’s car in the parking lot, and according to Vernon, Thamar tried to provoke him into violence so that Thamar could beat him or kill him. Vernon backed away from Thamar and retreated to his apartment.
Vernon made some efforts to inform Olsen, the Sun Harbor manager, of the situation between himself, Londa, and Thamar. On January 23, 1993, Vernon met with Olsen and told her that Thamar and his wife were having an affair and that he wanted Olsen to make Thamar stop pursuing the relationship. However, Vernon did not tell Olsen about the first threatening incident that occurred in the parking lot. Olsen stated that she would relate Vernon’s concerns to Thamar, but the record does not indicate if she did so. Additionally, in response to this discussion, Olsen sent Greg Aliano, another Sun Harbor security guard, to Vernon’s apartment to further discuss the situation and to gather more information.
A second threatening incident occurred on January 26, 1993, when Londa, who had briefly moved into Thamar’s apartment, was moving her things out of Thamar’s apartment and back into Vernon’s apartment after reconciling with Vernon. Thamar came downstairs from his apartment, pointed at Vernon with his finger, and threatened to shoot him. Vernon was a cab driver and was standing next to his cab and, fearing for his life, called the cab dispatcher to ask for help. The dispatcher called the police, who responded to the scene. Vernon informed the responding officer that Londa was attempting to move out of Thamar’s apartment and that Thamar was exhibiting aggressive behavior, but he apparently did not inform the officer that Thamar had threatened him. The officer talked with Thamar, and Thamar assured him that everything was fine. The officer then informed the security guard on duty what had happened and told the guard to likewise inform the person in charge.
On January 27, 1993, Vernon met with Olsen a second time and told her that he and his family were vacating the apartment and also told her again of the increasingly volatile situation between Thamar and himself. For the first time, he told her of Thamar’s threats and of the police responding to Sun Harbor the night before. Vernon also stated that several of his wife’s items still remained in Thamar’s apartment, that he wished to retrieve them, and that he was going to have the police escort him when he retrieved the items in order to avert a violent situation. Olsen stated that the police were not required and that she would provide Sun Harbor security personnel to help Londa get the rest of her belongings.
*1222 On January 27, 1993, after his meeting with Olsen, Vernon began moving the family’s belongings into storage in anticipation of moving into a new apartment complex. Vernon dropped Londa off at work and made several trips between the apartment and the storage facility. Vernon called Londa at work and informed her that they would be staying in a hotel for a few days. Londa indicated that she would be working all day and never stated that she was going to Thamar’s apartment. Without Vernon’s or Olsen’s knowledge, Thamar picked Londa up from work around 1:00 p.m. and took her back to his apartment. At the apartment, Londa told Thamar that the affair was over and that she was returning to her husband, and Thamar became incensed. He got his gun and shot Londa eighteen times, stopping to reload several times.
Thamar then used his radio to call Sun Harbor security to tell them what had happened. Aliano was off duty at the time of the shooting and heard Thamar’s call over his radio. He ascertained and went to Thamar’s location, handcuffed Thamar, and called the police. Thamar was later convicted of second degree murder with the use of a deadly weapon.
Vernon and Andrew originally sued only Sun Harbor for the wrongful death of Londa but later amended the complaint to include Bigelow as a second defendant.[3] The causes of action against Sun Harbor for respondeat superior, negligent hiring, training, and supervision, and breach of duty of care were all dismissed on summary judgment. The order granting summary judgment contained no findings of fact or conclusions of law.

DISCUSSION

Summary judgment is only appropriate when, after a review of the record viewed in a light most favorable to the non-moving party, there remain no issues of material fact, and the moving party is entitled to judgment as a matter of law. Butler v. Bogdanovich, 101 Nev. 449, 451, 705 P.2d 662, 663 (1985). “In determining whether summary judgment is proper, the nonmov-ing party is entitled to have the evidence and all reasonable inferences accepted as true.” Wiltsie v. Baby Grand Corp., 105 Nev. 291, 292, 774 P.2d 432, 433 (1989).
*1223 This court’s review of a summary judgment order is de novo. Tore, Ltd. v. Church, 105 Nev. 183, 185, 772 P.2d 1281, 1282 (1989). On appeal, this court is “required to determine whether the trial court erred in concluding that an absence of genuine issues of material fact justified its granting of summary judgment.” Bird v. Casa Royale West, 97 Nev. 67, 68, 624 P.2d 17, 18 (1981).
A. Cause of action for respondeat superior
“[Rjespondeat superior liability attaches only when the employee is under the control of the employer and when the act is within the scope of employment.” Molino v. Asher, 96 Nev. 814, 817, 618 P.2d 878, 879 (1980). Therefore, an actionable claim on a theory of respondeat superior requires proof that (1) the actor at issue was an employee, and (2) the action complained of occurred within the scope of the actor’s employment.
1. Was Thamar an employee of Sun Harbor?
This court has stated that “[tjhe employer can be vicariously responsible only for the acts of his employees not someone else, and one way of establishing the employment relationship is to determine when the ‘employee’ is- under the control of the ‘employer.’ ” National Convenience Stores v. Fantauzzi, 94 Nev. 655, 657, 584 P.2d 689, 691 (1978). “This element of control requires that the employer ‘have control and direction not only of the employment to which the contract relates but also of all of its details and the method of performing the work. . . .’ ” Kennel v. Carson City School District, 738 F. Supp. 376, 378 (D. Nev. 1990) (quoting 53 Am. Jur. 2d Master and Servant § 2 (1970)).
However, in the situation where a property owner hires security personnel to protect his or her premises and patrons, that property owner has a personal and non-delegable duty to provide responsible security personnel. Therefore, we conclude as a matter of law that the security personnel are the employees of the property owner, even if the property owner engaged a third party to hire the security personnel. In such a situation, we find an employer-employee relationship without evaluating whether the security personnel were under the control of the property owner, noting that the control analysis is only one of the methods *1224 available to establish such a relationship.[4] National Convenience Stores, 94 Nev. at 657, 584 P.2d at 691.
In reaching this conclusion, we follow the ruling in Peachtree-Cain Co. v. McBee, 316 S.E.2d 9 (Ga. Ct. App. 1984), aff’d, 327 S.E.2d 188 (Ga. 1985). In Peachtree-Cain Co., the Peachtree Company owned a shopping center called the Peachtree Center. Peachtree Center Management Company, a separate corporation, managed the Peachtree Center and contracted with American Building Maintenance Company to provide and manage security personnel for the property. All of these parties were sued by a patron who claimed to have been falsely arrested by a security guard. Peachtree Company moved for summary judgment on the ground that it could not be liable for the intentional torts of the independent security agent. The court denied the motion for summary judgment, concluding that:
As owners of the Peachtree Center complex that had undertaken to obtain security services, their duty to their invitees to provide responsible agents was personal and non-delegable, and thus it did not matter that the owners had an additional filter, i.e., the Peachtree Center Management Company, between themselves and the actual security guard. Because that duty was personal and non-delegable, a recovery based upon a breach of that duty would not constitute imposition of liability without fault. To hold that the appellants are immune from vicarious liability in these cases would, as noted above, present “opportunities for gross injustice” which we will not here sanction.
Peachtree-Cain Co., 316 S.E.2d at 11 (citations omitted); see Zentko v. G.M. McKelvey Co., 88 N.E.2d 265, 268 (Ohio Ct. App. 1948) (stating that where an owner of an operation or enterprise undertakes to obtain security services, the owner’s security duties are personal and non-delegable, and where the owner arranges for and accepts the services, the relationship of master and servant exists). Adams v. F.W. Woolworth Co., 257 N.Y.S. 776, 781 (App. Div. 1932) (“A store owner who places a detective agency on his premises for the purpose of protecting his property by various means, including arrests, should not be immune from responsibility to an innocent victim of a false arrest made by the detective agency, even as an independent contractor.”); Dupree v. Piggly Wiggly Shop Rite Foods, Inc., 542 *1225 S.W.2d 882, 888 (Tex. Ct. App. 1976) (“because of the ‘personal character’ of duties owed to the public by one adopting measures to protect his property, owners and operators of enterprises cannot, by securing special personnel through an independent contractor for the purposes of protecting property, obtain immunity from liability for at least the intentional torts of the protecting agency or its employees.”); see also Malvo v. J.C. Penney Company, Inc., 512 P.2d 575 (Alaska 1973); Noble v. Sears, Roebuck and Co., 109 Cal. Rptr. 269, 274 (Ct. App. 1973); Safeway Stores, Inc. v. Kelly, 448 A.2d 856, 861 n.12 (D.C. 1982) (recognizing the rule but not reaching the issue for other reasons); Hendricks v. Leslie Fay, Inc., 159 S.E.2d 362, 366-67 (N.C. 1968); Moore v. Target Stores, Inc., 571 P.2d 1236, 1240 (Okla. Ct. App. 1977).
Similarly, in the instant case, Sun Harbor undertook to obtain security services, a personal and non-delegable duty, and it did not matter that the owners of Sun Harbor had an additional filter, i.e., Bigelow, between themselves and the actual security guard. Additionally, Sun Harbor arranged for and accepted the security services of Thamar, and therefore the relationship of master and servant (or employer-employee) existed between Sun Harbor and the security guards.
2. Did Thamar’s intentional tort occur within the scope of his employment?
Generally, whether an employee is acting within the scope of his or her employment is a question for the trier of fact, but where undisputed evidence exists concerning the employee’s status at the time of the tortious act, the issue may be resolved as a matter of law. Evans v. Southwest Gas, 108 Nev 1002, 1004, 842 P.2d 719, 721 (1992).
This court has held that in order for an employer to be liable for the intentional tort of an employee, that tort must occur within the scope of the task assigned to the employee. Prell Hotel Corp. v. Antonacci, 86 Nev. 390, 391, 469 P.2d 399, 400 (1970). “[I]f the employee’s tort is truly an independent venture of his own and not committed in the course of the very task assigned to him, the employer is not liable.” Id. (holding that an employer was vicariously liable when the employee, a blackjack dealer, hit a customer in the face while dealing a game because the assault occurred within the scope of the task assigned to the dealer, that of dealing blackjack). But see J.C. Penney Co. v. Gravelle, 62 *1226 Nev. 434, 449-50, 155 P.2d 477, 481-82 (1944) (concluding that an on-duty security guard acted outside the scope of his employment when he punched Gravelle because Gravelle had prevented the guard from catching a shoplifter; the guard’s acts were done to punish Gravelle for his interference and not in order to catch the thief or to retrieve the stolen merchandise, and the guard’s actions were clearly disconnected from the line of his duty to his employer).
Vernon produced evidence that at the time Thamar shot Londa, he was still actively guarding the premises even though he was off duty, and that the off-duty security officers carried radios and responded to emergency situations. Furthermore, the record indicates that after Thamar shot Londa, he used his radio to call the Sun Harbor security dispatcher to report that his girlfriend had been shot, and Aliano, an off-duty security guard, heard the call on his radio, went to Thamar’s location, and handcuffed Thamar until the police arrived.
Conversely, Olsen’s affidavit presented evidence that off-duty security guards were not required to remain in radio contact with Sun Harbor or respond to emergency calls, and that their free time was their own. This indicates that when Thamar was off duty he was no longer engaged in the business of or service of his employer and Sun Harbor would not be liable. This conflicting evidence regarding whether Thamar was still acting within the scope of his employment when he killed Londa creates a genuine issue of material fact, and we conclude that it was improper for the district court to grant summary judgment on the respondeat superior cause of action.
B. Cause of action for negligent hiring, training, and supervision
It is a basic tenet that for an employer to be liable for negligent hiring, training, or supervision of an employee, the person involved must actually be an employee.[5] As we concluded in Section A(l), supra, as a matter of law Thamar was an employee *1227 of Sun Harbor by virtue of the fact that providing security for one’s premises and patrons is a personal and non-delegable duty, and that once the property owner accepts the services of the security personnel, the property owner cannot claim that the relationship of master and servant does not exist.
The only remaining question is whether Sun Harbor was negligent in hiring, training, and supervising Thamar. We conclude that genuine issues of material fact remained as to whether Sun Harbor was negligent in its hiring, training, and supervision of Thamar, and the district court erred by granting summary judgment in favor of Sun Harbor on this cause of action.
As to the cause of action for negligent hiring, Vernon produced evidence that Thamar had previously been fired from jobs for his violent behavior, that Thamar was a convicted sex offender, that Thamar lied on his application about his criminal past, and that Thamar possibly lied about his military background in Morocco. This creates a genuine issue of material fact as to whether Sun Harbor was negligent when it retained Thamar.
The dissent states that because respondents had no appreciable notice of Thamar’s violent propensities, they had no duty to make inquiries. However, the lack of notice does not relieve the employer of his “general duty ... to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position.” Burnett v. C.B.A. Security Service, 107 Nev. 787, 789, 820 P.2d 750, 752 (1991). Requiring Sun Harbor to make reasonable investigations regarding the security guards’ qualifications might be somewhat burdensome to Sun Harbor, especially in light of the fact that it contracted with Bigelow to do that job for it, but such investigations are commensurate with Sun Harbor’s personal and non-delegable duty to provide responsible security guards to protect its premises and patrons.
As to the cause of action for negligent supervision and training, Vernon produced evidence that Sun Harbor actively supervised the security guards and controlled both the details and methods of performing the guards’ work. Additionally, Vernon produced evidence that Sun Harbor possessed the ability to fire the security guards. Furthermore, Vernon presented evidence that in the days preceding the killing he twice spoke with Olsen regarding the evolving situation. On January 23, 1993, he informed Olsen of the affair between Londa and Thamar and requested that Olsen investigate the situation and get Thamar to end the relationship *1228 with Londa. In response to this discussion, Olsen sent Aliano to talk to Vernon and gather more information. On the morning of January 27, 1993, the day of the killing, Vernon informed Olsen that Londa had ended the affair, that Thamar had threatened his life while on duty, that he had called the police in response to the threats, and that he wished to call the police again to help him retrieve his wife’s belongings from Thamar’s apartment. Olsen stated, however, that she believed that the situation was a personal matter between Thamar and Vernon and that she had no right to interfere.
Based on this evidence, Vernon contended that Olsen had enough information to determine that Thamar was dangerous and that she acted negligently by not remedying the situation through adequate supervision or training. Sun Harbor contended that it acted properly at all times with regard to its actions toward Thamar. This is sufficient to create a genuine issue of material fact as to whether Sun Harbor negligently supervised and trained Thamar and the district court erred by granting summary judgment in favor of Sun Harbor on these issues.
C. Cause of action for Sun Harbor’s breach of duty to protect its tenants from the conduct of a third person
A land owner or occupier owes a duty to the people on the land to act reasonably under the circumstances. Moody v. Manny’s Auto Repair, 110 Nev. 320, 333, 871 P.2d 935, 943 (1994). This court has determined that consideration of the status of the injured person as trespasser, licensee, or invitee is no longer determinative and concluded that “determinations of liability should primarily depend upon whether the owner or occupier of land acted reasonably under the circumstances.” Id.
More specifically, when the issue is protecting a guest from the injury caused by a third person, this court has stated that “[tjhere is a duty to take affirmative action to control the wrongful acts of third persons only where the occupant of realty has reasonable cause to anticipate such act and the probability of injury resulting therefrom.” Thomas v. Bokelman, 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970). On the issue of foreseeability, this court has stated:
“Since the possessor is not an insurer of the visitor’s safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. ...”
*1229 Early v. N.L.V. Casino Corp., 100 Nev. 200, 203, 678 P.2d 683, 684 (1984) (quoting Restatement (Second) of Torts § 344 cmt. f (1965)).
We conclude that genuine issues of material fact also existed as to whether Sun Harbor could reasonably foresee that Thamar would commit a violent act and whether Sun Harbor acted reasonably under the circumstances.[6] Vernon presented evidence that on two occasions he informed Olsen of his marital situation, that he believed Thamar to be dangerous, and that Thamar had threatened to kill him. However, one of these conversations occurred four days prior to Londa’s death, and the other occurred on the day of Londa’s death. We conclude that these facts create a genuine issue of material fact as to whether Sun Harbor acted reasonably under the circumstances to protect its tenants from Thamar’s violent acts. Therefore, it was improper for the district court to grant summary judgment in favor of Sun Harbor on this cause of action.

CONCLUSION

The district court’s order granting summary judgment in favor of Sun Harbor was improper because genuine issues of material fact existed regarding whether Thamar was acting within the scope of his employment at the time he killed Londa, whether Sun Harbor negligently hired, trained, and supervised Thamar, and whether Sun Harbor breached its duty to protect its tenants from the conduct of a third person. Therefore, we reverse the district court’s order granting summary judgment in favor of Sun Harbor and remand the case to the district court for further proceedings consistent with this opinion.
Steffen, C. J., and Young and Shearing, JJ., concur.

Thamar was born in Morocco in 1956 and lived there until he moved to the United States in 1982.

In 1985, Thamar pleaded no contest in Wisconsin to one count of indecent exposure, was incarcerated in county jail for sixty days, and placed on probation for two years.

The causes of action against Bigelow were not addressed in the motion for summary judgment because that motion was fully briefed before Vernon amended the complaint to add Bigelow as a defendant. After summary judgment was granted in favor of Sun Harbor, Vernon voluntarily dismissed the amended complaint without prejudice as to Bigelow and then filed this appeal. Therefore, there are no issues pending in the district court, and this court can properly hear this appeal.

We make no determination on the issue of whether Thamar was an employee of Bigelow, although we note that it is possible for an employee to be simultaneously under the control of two different employers. See Gulf Oil Corp. v. Williams, 642 S.W.2d 270, 272 (Tex. Ct. App. 1982) (concluding that it is possible for two entities to have joint control over an employee).

When the cause of action is for negligent supervision, as opposed to respondeat superior, it does not matter if the employee’s actions occurred within or without his scope of employment. In a “common-law action charging the master with actionable negligence in retaining an incompetent and unfit employee, ... it is unnecessary to determine whether [the employee] was acting within the scope of his employment.” Stricklin v. Parsons Stockyard Company, 388 P.2d 824, 829 (Kan. 1964); see also Eifert v. Bush, 272 N.Y.S.2d 862, 865 (App. Div. 1966), aff’d, 291 N.Y.S.2d 372 (1968).

The dissent misreads this statement to mean that the majority has affirmatively stated that the duty of care owed to the tenants has been breached. Such is obviously not the case as the plain language clearly states only that genuine issues of material fact exist on this issue and that summary judgment was therefore improperly granted.